1　MICHAEL B. LUBIC (SBN 122591)
2　CONNOR J. MEGGS (SBN 336159)
　　K&L GATES LLP
3　10100 Santa Monica Boulevard
　　Eighth Floor
4　Los Angeles, CA  90067
　　Telephone: (310) 552-5000
5　Facsimile:  (310) 552-5001
　　Email:  michael.lubic@klgates.com
6　　　　　　connor.meggs@klgates.com

7　Attorneys for Creditor Hu-Hantwo LLC

8　　　　　　**UNITED STATES BANKRUPTCY COURT**

9　　　　　　**NORTHERN DISTRICT OF CALIFORNIA**

10　　　　　　**SAN FRANCISCO DIVISION**

11

12　In re                                                  Case No. 3:23-bk-30668-DM

13　NARIMAN SEYED TEYMOURIAN,          Chapter 7

14　　　　　　　　　Debtor.                    Adv. No. _____

15

16　HU-HANTWO LLC,                           **COMPLAINT TO DETERMINE**
　　　　　　　　　　　　　　　　　　　　**NONDISCHARGEABILITY OF DEBT**
17　　　　　　　　　Plaintiff,

18　　　　v.

19　NARIMAN SEYED TEYMOURIAN,

20　　　　　　　　　Defendant.

21

22　　　　Plaintiff Hu-HanTwo LLC ("Plaintiff") alleges as follows:

23　　　　　　　　**JURISDICTION AND VENUE**

24　　　　1.　　On October 3, 2023 (the "Petition Date"), Nariman Teymourian ("Debtor" or the

25　"Defendant") filed a voluntary petition under chapter 11 of title 11 of the United States Code (the

26　"Bankruptcy Code"), commencing the above-captioned bankruptcy case (the "Bankruptcy Case").

27

28

1

COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT

Case: 24-03003    Doc# 1    Filed: 01/08/24    Entered: 01/08/24 15:55:10    Page 1 of 56

2.     This adversary proceeding arises under the Bankruptcy Code and the Bankruptcy Case and is otherwise related to the Bankruptcy Case. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

3.     This is an adversary proceeding to determine the nondischargeability of debt, and is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

4.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

**PARTIES**

5.     The Plaintiff is a limited liability company formed under the laws of the state of California. The Plaintiff's principal office is in Atherton, California, and it is authorized to do business in California.

6.     The Plaintiff is informed and believes that the Defendant is an individual and was, on the Petition Date, a resident of San Mateo County, California. Plaintiff is further informed and believes that the Defendant is currently a resident of the state of Connecticut.

**FACTUAL ALLEGATIONS**

7.     On the Petition Date, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. The Bankruptcy Case is currently pending before this Court.

8.     The Defendant is the registered agent of, and upon information and belief, is the owner, operator and manager of, 201 El Camino Real LLC, a California limited liability company ("201ECR").

9.     The Defendant is the registered agent of, and upon information and belief, is the owner, operator and managing director of, Ferrando Diversified Capital LLC, a California limited liability company ("Ferrando").

10.     The principal address registered with the California Secretary of State for both 201ECR and Ferrando is 66 Barry Lane, Atherton, California 94027. Plaintiff is informed and believes that, on the Petition Date, this was the Defendant's residence address.

11.     The Defendant, in his capacity as the registered agent of both 201ECR and Ferrando, currently has a registered address of 66 Barry Lane, Atherton, California 94027 with the California Secretary of State.

12.     In or around July 2022, the Plaintiff entered into a transaction (the "Transaction") whereby the Plaintiff agreed to sell, and 201ECR agreed to purchase, certain real property commonly known as 201 El Camino Real, 612 Cambridge Avenue, Menlo Park, California 94025 (the "Property") for a purchase price of roughly $11,400,000.

13.     Prior to the Transaction and as inducement for the Plaintiff to enter into the Transaction (including in connection with the Note and the Pledge Agreement defined below), the Defendant represented, and produced documentation to the Plaintiff showing, among other things, an account statement for an account held by Fernando at Wells Fargo dated April 30, 2022, showing that the account held certain corporate bonds issued by Clear TV Media USA, CPN 5.750%, due 6/30/2029, CUSIP 18468TAB9 (the "Bonds") in the principal amount of $150,000,000 with a current market value of $150,416,400 and that, on April 20, 2022, additional Bonds in the principal amount of $100,000,000 with a value of $101,768,000 were transferred out of the account (the "Wells Statement"). The Wells Statement indicates that the Defendant indirectly owned and controlled $250,000,000 of Bonds through his ownership interest in Ferrando. A true and correct copy of the Wells Statement is attached hereto as Exhibit 1.

14.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant knew that the Bonds had little or no value.

15.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant knew that Clear TV Media, the issuer of the Bonds, had not received the full face amount of the Bonds when they were issued.

16.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant knew that Clear TV Media was likely unable to honor the obligations evidenced by the Bonds.

3

17.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant knew that Clear TV Media had failed to make any payments of interest on the Bonds as required by the offering documents.

18.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant knew that the Bonds were acquired from Clear TV Media by Ferrando without payment of value commensurate with the face amount of the Bonds acquired.

19.     The Plaintiff is informed and believes, and on that basis avers, that at the time the Defendant provided the Wells Statement to the Plaintiff, the Defendant intended to use the Bonds as part of a scheme to defraud lenders, including the Plaintiff, by fraudulently misrepresenting his financial condition and by pledging the Bonds to lenders, including the Plaintiff, all to induce lenders to extend credit and, in the case of the Plaintiff, credit purportedly secured by the Bonds.

20.     As inducement for the Plaintiff to enter into the Transaction, the Defendant caused 201ECR to execute that certain Promissory Note, dated as of July 29, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), promising to pay the principal sum of $7,200,000.00, representing a portion of purchase price for the Property, to the Plaintiff. A true and correct copy of the Note is attached hereto at Exhibit 2.

21.     As additional inducement for the Plaintiff to enter into the Transaction, and as security for the payment and performance of the Note, the Defendant caused Ferrando to execute that certain Collateral Pledge Agreement, dated as of July 28, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pledge Agreement"), whereby Ferrando granted a security interest and lien to the Plaintiff on certain Bonds. A true and correct copy of the operative amended and restated Pledge Agreement is attached hereto at Exhibit 3.

22.     On or about June 16, 2022, the Defendant and the Plaintiff executed that certain Letter Agreement re: Seller Carry Loan Agreement for Above-Referenced Properties (the "Letter Agreement"). A true and correct copy of the Letter Agreement is attached hereto at Exhibit 4.

23.     The Letter Agreement states that the Note would be secured by the Bonds held in Ferrando's Wells Fargo Wealth Management Account, and that the total asset value was $157,628,858.32 as of April 30, 2022.

24.     Upon information and belief, Ferrando did not pay any material amount of cash in exchange for the Bonds, notwithstanding their purported worth in excess of $150 million.

25.     Upon information and belief, the issuer of the Bonds did not receive any material cash proceeds from the issuance of the Bonds and is not a bona fide business as described in its offering materials.  Instead, the Bonds were "issued" for the purpose of defrauding third-party lenders and investors.

26.     Upon information and belief, the principal of Clear TV Media USA ("Clear TV"), the entity that issued the Bonds, is currently or recently was in prison for investor fraud.

27.     The California Secretary of State's website reflects that Clear TV's corporate status is forfeited.  It further reflects that Clear TV operates out of a single family residence located at 3838 Grandview Drive, Brea, California.

28.     The purported insurer of the Bonds is Bountiful Assurance of the Bahamas ("BBAB").  Upon information and belief, BBAB is not in the business of providing credit insurance for corporate bonds, and did not issue insurance for the Bonds.

29.     Upon information and belief, interest payments have not been and are not being made with respect to the Bonds.

30.     Upon information and belief, the Bonds are effectively worthless.

31.     Concurrent with the closing of the Transaction, 201ECR refinanced the Property and received approximately $2,600,000 in cash (the "Refinancing").  A true and correct copy of the escrow closing statement for the Transaction showing the Refinancing and the payment to 201ECR of the $2.6 million is attached hereto as Exhibit 5.

32.     The Plaintiff is informed and believes, and based thereon avers, that some or all of the funds received in the Refinancing were transferred to or for the benefit of the Defendant with actual intent to hinder, defraud, and delay the Plaintiff and other creditors of 201ECR.

33.     The Defendant represented to the Plaintiff that the proceeds of the Refinancing would be used to make payments on the Note and to improve the Property.  However, when the first payment came due on the Note, 201ECR claimed that it did not have sufficient funds to make the payment.  Further, no visible improvements have been made on the Property.

34.     The Plaintiff has been unable to determine what happened to the proceeds of the Refinancing.

35.     To date, the Plaintiff has not received any payments on the Note.

36.     As a result of 201ECR's nonpayment of the Note, the Note is in default, the balance thereof has been accelerated and the Note is presently due and owing.

37.     In reliance on the Wells Statement, Note, Pledge Agreement, Letter Agreement, the Defendant's representations of the value of the Bonds and the other documentation produced by the Defendant and/or executed in connection therewith, the Plaintiff was induced to, and did, transfer title to the Property to 201ECR.

### FIRST CLAIM FOR RELIEF

(Obtaining Credit and Property by False Pretenses

and/or False Representation – 11 U.S.C. § 523(a)(2)(A))

38.     The Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 37 of the Complaint as though fully set forth herein.

39.     The Defendant's representations and statements that Ferrando owned Bonds worth more than $150 million, and that the Bonds were issued in the total amount of $250,000,000, were intended to, and did, induce the Plaintiff to extend credit to 201ECR under the Note and sell 201ECR the Property.

40.     The Defendant's representation and statement that the Refinancing of the Property would generate cash that would be used to make payments to the Plaintiff and to improve the Property was intended to, and did, induce the Plaintiff to extend credit to 201ECR under the Note and sell 201ECR the Property.

41.     At all relevant times, the Defendant knew that no material cash consideration was paid in exchange for the Bonds and that the Bonds were effectively worthless and/or fraudulent.

6

42.     At all relevant times, neither the Defendant nor 201ECR had any intention to utilize the proceeds of the Refinancing to repay the Plaintiff.

43.     At all relevant times, the Defendant knew that neither he nor 201ECR had any ability to repay the Note or otherwise pay the purchase price for the Property.

44.     The Plaintiff justifiably relied on the Defendant's statements regarding Ferrando's ownership and the value of the Bonds and extended credit to 201ECR under the Note and sold the Property to 201ECR with the belief that the Defendant was creditworthy and the expectation that the Bonds were valuable and secured repayment of the Note.

45.     The Plaintiff justifiably relied on the Defendant's statements regarding the purpose of the Refinancing and the intended use of the proceeds therefrom, and extended credit to 201ECR under the Note and sold the Property to 201ECR with the expectation that the proceeds from the Refinancing would be used to improve the Property and make payments to the Plaintiff.

46.     The Plaintiff has been damaged by the extension of credit to 201ECR under the Note and the sale of the Property to 201ECR.  201ECR has defaulted under the Note and owes the Plaintiff $7,200,000 in principal, plus accrued and unpaid interest, fees and charges.

47.     The Plaintiff has been further damaged in that its collateral, the Bonds, is effectively worthless.  The Plaintiff has been further damaged in that the proceeds of the Refinancing were not used to improve the Property or make payments on the debt owed to the Plaintiff or to the secured lender.

48.     The Defendant's false representations to the Plaintiff and fraud in connection with the Wells Statement, the Bonds and the Refinancing render the damages suffered by the Plaintiff as a result thereof, including, but not limited to, the debt owed to the Plaintiff under the Note, nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A).

**<u>SECOND CLAIM FOR RELIEF</u>**

(Obtaining Credit and Property by Use of a False

Statement in Writing – 11 U.S.C. § 523(a)(2)(B))

49.     The Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 48 of the Complaint as though fully set forth herein.

7

50.     The Defendant provided the Plaintiff with written statements, including, but not limited to, the Letter Agreement and the Wells Statement, that materially misrepresented the value of the Bonds.

51.     The Defendant provided the Plaintiff with these false written statements with the intention of inducing the Plaintiff to extend credit to 201ECR under the Note and sell 201ECR the Property.

52.     At all relevant times, the Defendant knew that the Bonds were effectively worthless and/or fraudulent, and that neither the Defendant nor 201ECR had the financial means to the repay the Note or otherwise pay for the Property.

53.     The Defendant's representations about the value of the collateral securing the Note were materially false.

54.     The Defendant made the foregoing representations with the intent to deceive the Plaintiff and induce the Plaintiff to extend credit and transfer title to the Property to 201ECR.

55.     The Plaintiff justifiably relied on the Defendant's misrepresentations and written documents.

56.     The Plaintiff has been damaged by the extension of credit to 201ECR under the Note and the sale of the Property to 201ECR.  201ECR has defaulted under the Note and owes the Plaintiff $7,200,000 in principal, plus accrued and unpaid interest, fees and charges.

57.     The Plaintiff has been further damaged in that its collateral, the Bonds, are effectively worthless.

58.     The Defendant's written misrepresentations to the Plaintiff in connection with the Bonds render the damages suffered by the Plaintiff as a result thereof, including, but not limited to, the debt owed to the Plaintiff under the Note, nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B).

### THIRD CLAIM FOR RELIEF

(Willful and Malicious Injury – 11 U.S.C. § 523(a)(6))

59.     The Plaintiff repeats, realleges and incorporates by reference paragraphs 1 through 58 of the Complaint as though fully set forth herein.

8

60. The Defendant intentionally, without just cause or excuse, made false representations and statements regarding the value of the Bonds owned by Ferrando, the validity of the Bonds, and the intended purpose of and use of cash proceeds from the Refinancing.

61. The Defendant made these false representations in order to induce the Plaintiff to extend credit to 201ECR under the Note and sell 201ECR the Property.

62. At all relevant times, the Defendant knew that no material cash consideration was not in exchange for the Bonds and that the Bonds were effectively worthless and/or fraudulent.

63. At all relevant times, neither the Defendant nor 201ECR had any intention to utilize the proceeds of the Refinancing to repay the Plaintiff or to improve the Property.

64. At all relevant times, the Defendant knew that neither it nor 201ECR had the ability to repay the Note or otherwise pay the purchase price for the Property.

65. The Defendant knew, or at the very least, it was reasonably foreseeable to the Defendant, that Plaintiff's extension of credit to 201ECR and sale of the Property to 201ECR, combined with the Defendant's and 201ECR's inability to pay and the worthlessness of the collateral, would necessarily cause the Plaintiff injury.

66. The Plaintiff justifiably relied on the Defendant's misrepresentations and false statements in writing.

67. The Plaintiff has been damaged by the extension of credit to 201ECR under the Note and the sale of the Property to 201ECR. 201ECR has defaulted under the Note and owes the Plaintiff $7,200,000 in principal, plus accrued and unpaid interest, fees and charges.

68. The Plaintiff has been further damaged in that its collateral, the Bonds, are effectively worthless. The Plaintiff has been further damaged in that the proceeds of the Refinancing were not used to improve the property or to make payments on the debt owed to the Plaintiff or the secured lender.

69. The Defendant's intentional false representations to the Plaintiff and fraud in connection with the Bonds and the Refinancing render the damages suffered by the Plaintiff as a result thereof, including, but not limited to, the debt owed to the Plaintiff under the Note, non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(6).

9

**PRAYER**

WHEREFORE, the Plaintiff prays as follows:

1.      That this Court determine that the outstanding balance owed to the Plaintiff by the Defendant under the Note is nondischargeable pursuant to 11 U.S.C. § 523;

2.      That the costs of this action be taxed to the Defendant;

3.      That the Plaintiff may have and recover such other and further additional relief as it may be entitled to under the facts and applicable law.

Respectfully submitted,

MICHAEL B. LUBIC
CONNOR J. MEGGS
K&L GATES LLP

Dated:  January 8, 2024        By: _____
                            Michael B. Lubic

Attorneys for Creditor Hu-Hantwo LLC

# EXHIBIT 1

Case: 24-03003    Doc# 1    Filed: 01/08/24    Entered: 01/08/24 19:58:10    Page 11 of 56



**Advisors**

# SNAPSHOT
## Current period ending April 30, 2022

ACCOUNT NAME:      FERRANDO DIVERSIFIED
CAPITAL, LLC

ACCOUNT NUMBER:      5754-1611

## Electronic Delivery

Your Financial Advisor:
B. LIN / M. HARTMEYER /
S. ABBAY
Phone: 833-686-0861 / 415-396-6525
Service Team: 877-646-8560

420 MONTGOMERY ST
7TH FL
SAN FRANCISCO, CA 94104

If you have more than one account with us, why not link them and receive summary information for your entire household? Contact Your Financial Advisor for more details.

FERRANDO DIVERSIFIED
CAPITAL, LLC
247 ATHERTON AVE
ATHERTON    CA 94027-5436

### Message from Wells Fargo Advisors
YOU DON'T HAVE TO TRADE GROWTH POTENTIAL FOR PRINCIPLES WHEN ALIGNING YOUR INVESTMENT PORTFOLIO TO YOUR PERSONAL VALUES. FIND OUT MORE IN OUR NEW "VISION INVESTING" REPORT ONLINE AT WELLSFARGO.COM/VISION.

### News
YOU CAN ENROLL, MANAGE RECIPIENTS, AND SEND WIRES FROM YOUR DESKTOP OR MOBILE DEVICE. ONLINE ACCESS REQUIRED AND WIRE LIMITS APPLY. FOR ELIGIBILITY RULES, VISIT WELLSFARGO.COM/ONLINE-BANKING/WIRES TO LEARN MORE.

**Investment and Insurance Products are:**
· Not Insured by the FDIC or Any Federal Government Agency
· Not a Deposit or Other Obligation of, or Guaranteed by, the Bank or Any Bank Affiliate
· Subject to Investment Risks, Including Possible Loss of the Principal Amount Invested

Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC, a registered broker-dealer and non-bank affiliate of Wells Fargo & Company.

# General instructions and disclosures

## About this statement

**Clearing services:** Wells Fargo Clearing Services, LLC (Wells Fargo Advisors), an indirect wholly owned subsidiary of Wells Fargo & Company, is a clearing broker-dealer registered with the Securities and Exchange Commission (SEC) and the Municipal Securities Rulemaking Board (MSRB) and is a member of the New York Stock Exchange (NYSE), the Financial Industry Regulatory Authority (FINRA) and all principal U.S. exchanges. Wells Fargo Advisors carries your account(s) and acts as your custodian for funds and securities deposited with us directly by you, or as a result of transactions we process for your account. Twice a year, Wells Fargo Advisors publishes on its web site **www.wfclearing.com** a statement of the firm's financial condition. A financial statement of this organization is available for your personal inspection at its offices, or a copy of it will be mailed upon your written request.

**Trade date statement and trade details:** All activity and positions on this statement are shown as of the date a trade is entered on the brokerage trading system (i.e., the trade date). Proceeds from the sale of securities and costs for the purchase of securities are not transacted through your account until the actual settlement date of the trade. The time of the transactions, the name of the buyer or seller, and the source and amount of any commission or fee will be furnished upon written request.

**Pricing of securities:** Securities prices on your statement may vary from actual liquidation value. Prices are provided by outside quotation services which we believe are reliable but due to the nature of market data the accuracy cannot be guaranteed. In the absence of such pricing, prices are estimated by Wells Fargo Advisors using available information and its judgment. Such estimates may not reflect actual trades and do not reflect a commitment by the firm to buy or sell at those prices. Securities listed on a national exchange are priced as of the close of the statement period. Unlisted shares may be valued at the current best published "bid-price", and, if none exists, the last reported transaction if occurring within the last 45 days. Prices of securities not actively traded may not be available and are indicated by "N/A." Corporate and municipal bonds and other fixed income securities are priced by a computerized pricing service or, if less actively traded, by utilizing a yield-based matrix system to arrive at an estimated market value. Listed options are priced based on the closing "bid-ask" prices and the last reported trade. Mutual fund shares are priced at net asset value. Shares of direct participation program (DPP) and real estate investment trust (REIT) securities that are not listed on a national exchange are generally illiquid. Because no trading market exists for these investments, their values are estimated. Unless otherwise indicated, the values shown for DPP and REIT securities have been provided by the management of each program and represent that management's estimate of the investor's interest in the net assets of the program. See statement sections for additional pricing information. Values for hedge funds and certain managed futures funds are provided on a month delay basis. Other managed futures funds may be priced more frequently. Long-term certificates of deposit (maturity beyond one year from date of issue) are priced using a market value pricing model. The sale or redemption price of your securities may be higher or lower than the prices shown on your statement. For an actual quote, contact the individual servicing your account.

**Estimated annual income/yield:** Estimated Annual Income (EAI), when available, reflects the estimated amount you would earn on a security if your current position and its related income remained constant for a year. Estimated Annual Yield (EAY), when available, reflects the current estimated annual income divided by the current value of the security as of the statement closing date. EAI and EAY are estimates and the actual income and yield might be lower or higher than the estimated amounts. EAY reflects only the income generated by an investment. It does not reflect changes in its price, which may fluctuate. The information used to derive these estimates is obtained from various outside vendors; Wells Fargo Advisors  is not responsible for incorrect or missing estimated annual income and yields. Past performance is not a guarantee of future results.

**Income summary:** The Income summary displays all income as recorded in the tax system as of period end date. The totals in the Cash flow snapshot may not match the totals in the Income snapshot due to reclassifications or other corrections made in the tax system. Remember, you may have certain products that are not included in these figures and whose income is only available on the tax forms sent to you at year-end. Reclassifications and other tax reporting requirements may alter these numbers both during and after year end. You should rely only on tax reporting documents. Contact your tax advisor if you have any questions about the tax consequences of your brokerage activity.

**Texas designation:** If you are a resident of Texas who has purchased mutual fund shares, you may designate a representative to receive notification to assist in avoiding escheatment of assets in your investment account to the State of Texas. The designated representative does not have any rights to your account. Please use the Texas Unclaimed Property link (**https://claimittexas.org/**) to access the Designation of Representative for Notice Request form which you may complete and return to us at **ATTN: H0006-08K, 1 N. Jefferson Ave, St. Louis, MO 63103** or return by email at **clientcontact@firstclearing.com**.

**Tax reporting:** We are required by federal law to report annually to you and to the Internal Revenue Service (IRS) on Form(s) 1099  interest income, dividend payments and sales proceeds including cost basis information for applicable transactions credited to your account.

## About your rights and responsibilities

**Questions and complaints about Your Account:** This account statement contains important information about your brokerage account, including recent transactions. All account statements sent to you shall be deemed complete and accurate if not objected to in writing within ten days of receipt. We encourage you to review the details in this statement. If you do not understand any of the information in your statement or if you believe there are any inaccuracies or discrepancies in your statement, you should promptly report them to the manager of the Wells Fargo Advisors office listed on the front of your statement. To further protect your rights, including any rights under the Securities Investor Protection Act, any verbal communications with Wells Fargo Advisors should be re-confirmed in writing. Inquiries or complaints about your account statement, including the positions and balances in your account, may be directed to **Wells Fargo Advisors Client Services at (866) 887-2402 or ATTN: H0005-087, 1 N. Jefferson Ave, St. Louis, MO 63103.**

**Public disclosure:** You may reach FINRA by calling the FINRA BrokerCheck Hotline at **(800) 289-9999** or by visiting the FINRA website at **www.finra.org**. An investor brochure that includes information describing FINRA BrokerCheck is available from FINRA upon request. A brochure describing the FINRA Pricing of Securities Regulation Public Disclosure Program is also available from the FINRA upon request.

**MSRB disclosure:** A brochure describing the protections available under MSRB rules and how to file a complaint is available at **www.MSRB.org**.

**Account protection:** Wells Fargo Advisors is a member of the Securities Investor Protection Corporation (SIPC) which protects against the loss of cash and securities held in client accounts of a SIPC member firm in the event of the member's insolvency and liquidation. SIPC coverage is limited to $500,000 per customer, including up to $250,000 for cash. For more information on SIPC coverage, please see the explanatory brochure at **www.sipc.org** or contact SIPC at **(202) 371-8300**. In addition, Wells Fargo Advisors maintains additional insurance coverage provided through London Underwriters (led by Lloyd's of London Syndicates). This additional insurance policy becomes available to clients if their SIPC limit is exhausted and provides additional protection up to a firm aggregate of $1 billion, including up to $1.9 million for cash per client. SIPC does not insure the quality of investments or protect against market losses. SIPC only protects the custody function of their members, which means that SIPC works to restore to clients their securities and cash that are in their accounts when the member firm liquidation begins. Not all investments are protected by SIPC. In general, SIPC does not cover instruments such as unregistered investment contracts, unregistered limited partnerships, fixed annuity contracts, escrow receipts, direct investments, currency, commodities or related contracts, hedge funds and certain other investments.

**Investor education:** Wells Fargo Advisors publishes on its web site **www.wellsfargoadvisors.com** information on topics of interest to investors as well as market commentary and economic analysis. This information may be found in the "Other Insights" menu. Wells Fargo Advisors has also developed numerous investor education guides to provide you with important information regarding the products and services we offer. These guides may be found in the "Why Invest With Us" menu.

**Free credit balances:** Free credit balances are not segregated and may be used by Wells Fargo Advisors in the operation of its business in accordance with applicable laws and regulations. You have the right to receive from us in the course of normal business operations, subject to any open commitments in any of your accounts, any free credit balances to which you are entitled.

**Investment objectives/Risk tolerances:** Please inform us promptly of any material change that might affect your investment objectives, risk tolerances or financial situation, or if you wish to impose or change any reasonable restrictions on the management of your account. A copy of the Investment Advisory Services Disclosure document is available without charge upon request. Please contact the individual denoted on the front of your statement to update your information and to receive a copy of this document.

**Option accounts:** Pursuant to FINRA Rule 2360, option assignment notices are randomly allocated by an automated process amongst all client short option positions that are subject to exercise, including positions established on the day of assignment. Transaction confirmations that were previously furnished to you provides information on commissions and other charges related to your option transaction executions. Details of our random allocation procedures and copies of transaction confirmations are available upon request.



**Advisors**

**FERRANDO DIVERSIFIED
CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER: 5754-1611

## Progress summary

|  | THIS PERIOD | THIS YEAR |
|---|---|---|
| **Opening value** | **$255,686,771.26** | **$1,771.21** |
| Cash deposited | 0.00 | 0.00 |
| Securities deposited | 0.00 | 0.00 |
| Cash withdrawn | -1,771.26 | -1,771.26 |
| Securities withdrawn | -101,768,000.00 | -101,768,000.00 |
| Change in value | -3,500,600.00 | 252,184,400.05 |
| **Closing value** | **$150,416,400.00** | **$150,416,400.00** |
| Estimated accrued interest ^ | 7,211,458.32 | |
| **Total value (incl. accruals)** | **$157,627,858.32** | |

^ Estimated accrued interest is included for your convenience. The value represents the estimated portion of the interest that would be received upon the sale of your Fixed Income positions. For more information, see the Specific instructions and disclosures page.

## Value over time



## Portfolio summary



**CURRENT**

| | ASSET TYPE | PREVIOUS VALUE ON MAR 31 | % | CURRENT VALUE ON APR 30 | % | ESTIMATED ANN. INCOME |
|---|---|---|---|---|---|---|
| **ASSETS** | Cash and sweep balances | 1,771.26 | 0.00 | 0.00 | 0.00 | 0 |
| | Stocks, options & ETFs | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | Fixed income securities | 255,685,000.00 | 100.00 | 150,416,400.00 | 100.00 | 8,625,000 |
| | Mutual funds | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | Preferreds/fixed rate cap secs* | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | **Asset value** | **$255,686,771.26** | **100%** | **$150,416,400.00** | **100%** | **$8,625,000** |

* You have one or more unpriced securities in your account.

Case: 24-03003    Doc# 1    Filed: 01/08/24    Entered: 01/08/24 19:58:10    Page 14 of 56

SNAPSHOT
020 NG NG3J

**FERRANDO DIVERSIFIED
CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER:  5754-1611

## Cash flow summary

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| **Opening value of cash and sweep balances** | **$1,771.26** | |
| Income and distributions | 0.00 | 0.05 |
| **Net additions to cash** | **$0.00** | **$0.05** |
| Electronic funds transfers | -1,771.26 | -1,771.26 |
| **Net subtractions from cash** | **-$1,771.26** | **-$1,771.26** |
| **Closing value of cash and sweep balances** | **$0.00** | |

## Income summary *

| | | THIS PERIOD | THIS YEAR |
|---|---|---|---|
| **TAXABLE** | Money market/sweep funds | 0.00 | 0.05 |
| | **Total taxable income** | **$0.00** | **$0.05** |
| | **Total federally tax-exempt income** | **$0.00** | **$0.00** |
| | **Total income** | **$0.00** | **$0.05** |

* Certain distributions made in the current year are reported as prior year income according to IRS regulations.  This may cause a difference between Cash Flow and Income Summary totals.

## Gain/loss summary

| | UNREALIZED | THIS PERIOD REALIZED | THIS YEAR REALIZED |
|---|---|---|---|
| Short term (S) | 0.00 | 0.00 | 0.00 |
| Long term (L) | 0.00 | 0.00 | 0.00 |
| **Total** | **$0.00** | **$0.00** | **$0.00** |



**Advisors**

**SNAPSHOT** ████████████████████

FERRANDO DIVERSIFIED
CAPITAL, LLC

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER:  5754-1611

## Your Financial Advisor

B. LIN / M. HARTMEYER /
S. ABBAY
Phone: 833-686-0861 / 415-396-6525

420 MONTGOMERY ST
7TH FL
SAN FRANCISCO, CA  94104

## Your Wealth Management Relationship Manager

SEAN R PRYDEN (Wells Fargo Bank, N.A.)
Phone: 707-521-1205

Refer to Specific instructions and disclosures page for information about affiliations.

## Account profile

| | |
|---|---|
| Full account name: | FERRANDO DIVERSIFIED CAPITAL, LLC |
| Account type: | Brokerage Cash Services |
| Brokerage account number: | 5754-1611 |
| Brokerage Cash Services number: | 1223936095 |
| Tax status: | Taxable |
| Investment objective/Risk tolerance:* | MODERATE INCOME |
| Time horizon:* | LONG TERM (10+ YEARS) |
| Liquidity needs:* | NONE |
| Cost Basis Election: | First in, First out |
| Sweep option: | EXPANDED BANK DEPOSIT |

*For more information, please visit us at:  www.wellsfargoadvisors.com/disclosures

## Available funds

| | |
|---|---|
| Cash | 0.00 |
| Money market and sweep funds | 0.00 |
| Available for loan | 0.00 |
| **Your total available funds** | **$0.00** |

## Client service information

| | |
|---|---|
| Service Team: | 877-646-8560 |
| Website: | www.wellsfargoadvisors.com |

## For your consideration

Go paperless.  Accessing your account documents online is easy, secure, and costs nothing.  Sign on at wellsfargoadvisors.com, go to **Portfolio** and select **Statements & Docs**, and then click on the **Delivery Preferences** link.  Choose **Paperless - All Docs** or view your Delivery Settings details to select specific account documents for paperless delivery.  If you do not have a Username and Password, visit **wellsfargoadvisors.com/signup** or call 1-877-879-2495 for enrollment assistance.

## Document delivery status

Email Address:  NARIMANTEY@GMAIL.COM

| | Paper | Electronic |
|---|---|---|
| Statements: | | X |
| Trade confirmations: | | X |
| Tax documents: | X | |
| Shareholder communications: | | X |
| Other documents: | | X |

SNAPSHOT
020 NG NG3J

**FERRANDO DIVERSIFIED
CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER:  5754-1611

# Portfolio detail

## Fixed Income Securities

Corporate and municipal bonds and other fixed income securities are priced by a computerized pricing service or, for less actively traded issues, by utilizing a yield-based matrix system to arrive at an estimated market value.

### Corporate Bonds

| DESCRIPTION | % OF ACCOUNT | QUANTITY | ADJ PRICE/ ORIG PRICE | ADJ COST/ ORIG COST | CURRENT PRICE | CURRENT MARKET VALUE | UNREALIZED GAIN/LOSS | ESTIMATED ACCRUED INTEREST | ANNUAL INCOME | ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| CLEAR TV MEDIA USA INC INSURED NT ACCD INV CPN  5.750% DUE 06/30/29 DTD 07/24/19 FC 12/01/19 CUSIP 18468TAB9 | | | | | | | | | | |
| Acquired UNKNOWN S nc | 100.00 | 150,000,000 | N/A## | N/A& | 100.2776 | 150,416,400.00 | N/A | 7,211,458.32 | 8,625,000 | 5.73 |
| **Total Corporate Bonds** | **100.00** | **150,000,000** | | **$0.00** | | **$150,416,400.00** | **$0.00** | **$7,211,458.32** | **$8,625,000** | **5.73** |
| **Total Fixed Income Securities** | **100.00** | | | **$0.00** | | **$150,416,400.00** | **$0.00** | **$7,211,458.32** | **$8,625,000** | **5.73** |

& Insufficient data available for accurate cost or other basis adjustment.
## Cost information for one or more securities is not available. If you have cost information and would like to see it on future statements, contact Your Financial Advisor.
nc Cost information for this tax lot is not covered by IRS reporting requirements. Unless indicated, cost for all other lots will be reported to the IRS.

020 NG NG3J

 **Advisors**

**FERRANDO DIVERSIFIED
CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER:  5754-1611

## Preferreds/Fixed Rate Cap Securities

| DESCRIPTION | % OF ACCOUNT | QUANTITY | ADJ PRICE/ ORIG PRICE | ADJ COST/ ORIG COST | CURRENT PRICE | CURRENT MARKET VALUE | UNREALIZED GAIN/LOSS | ESTIMATED ANNUAL INCOME | ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|---|
| GREYS FINL LTD      PFD PFD CL B | | | | | | | | | |
| Acquired UNKNOWN S nc | | 74,910,000 | N/A## | N/A | N/A* | N/A | N/A | N/A | N/A |
| **Total Preferreds/Fixed Rate Cap Securities** | **0.00** | | | **$0.00** | | **$0.00** | **$0.00** | | |

\* This unpriced security is not reflected in your total portfolio value.
## Cost information for one or more securities is not available. If you have cost information and would like to see it on future statements, contact Your Financial Advisor.
nc Cost information for this tax lot is not covered by IRS reporting requirements. Unless indicated, cost for all other lots will be reported to the IRS.

## Activity detail

### Electronic funds transfer

| DATE | ACCOUNT TYPE | TRANSACTION | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 04/01 | Cash | AUTO ACTIVITY | Foris Inc MCB    PAYMENT 3b3c8b24848448a | -1,000.00 |
| 04/07 | Cash | AUTO ACTIVITY | ONLINE TRANSFER | -771.26 |
| | | | TO 2700 MIDDLEFIELD ROAD LLC BUSINESS CHECKING XXXXXX5772 REF #IB0DZN3N7T ON 04/05/22 | |
| | | | **Total Electronic funds transfer:** | **-$1,771.26** |

020 NG NG3J

**FERRANDO DIVERSIFIED CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER: 5754-1611

# Non cash activity detail

This section displays security transfer activity for the current period. The price and value are as of the date of the transfer.

## Transfers out

| DATE | ACCOUNT TYPE | TRANSACTION | QUANTITY | DESCRIPTION | PRICE | VALUE |
|------|--------------|-------------|----------|-------------|-------|-------|
| 04/20 | Cash | TRANSFER | -100,000,000.00000 | CLEAR TV MEDIA USA INC INSURED NT ACCD INV CPN 5.750% DUE 06/30/29 DTD 07/24/19 FC 12/01/19 CUSIP 18468TAB9 TO: ****6667-1 TO:34486667 | 101.7680 | -101,768,000.00 |
| | | | | **Total Transfers out:** | | **-$101,768,000.00** |

# Cash sweep activity

Our Cash Sweep program allows you to earn a return on the idle cash balances in your account by automatically investing such balances into one of our cash sweep options. These 'sweep transactions' may represent a net amount for the day and occur on settlement date. The following section displays transfers into and out of your sweep option. Transactions displayed here are Transfer To, Transfer From and Reinvested Dividends and Interest. These transaction amounts are not included in your cash flow summary.

| DATE | TRANSACTION | DESCRIPTION | AMOUNT | DATE | TRANSACTION | DESCRIPTION | AMOUNT |
|------|-------------|-------------|--------|------|-------------|-------------|--------|
| 04/01 | | BEGINNING BALANCE | 1,771.26 | 04/07 | TRANSFER FROM | EXPANDED BANK DEPOSIT | -771.26 |
| 04/01 | TRANSFER FROM | EXPANDED BANK DEPOSIT | -1,000.00 | 04/30 | | ENDING BALANCE | 0.00 |

 **Advisors**

**FERRANDO DIVERSIFIED CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER: 5754-1611

---

# Bank Deposits Through Teller                                                    April 1 - April 30

## Wells Fargo Bank, N.A. (Member FDIC)       Account number 1223936095        Questions?  Call us at 1-877-646-8560

Deposits made in a bank branch on the last business day of the month will typically appear on your next statement.

| DATE | TRANSACTION | DESCRIPTION | AMOUNT | BANK BALANCE |
|---|---|---|---|---|
| 04/01 | | BEGINNING BALANCE | | $0.00 |
| 04/30 | | ENDING BALANCE | | $0.00 |

---

# Specific instructions and disclosures

**Available funds**

"Available for loan" reflects the approximate amount available as of the statement period ending date and should be reduced by any pending checks and Visa charges not yet cleared.  This amount is the approximate amount available for withdrawal and loans.  A margin loan is a variable rate loan secured by your account.

**Callable Securities**

Securities that are subject to a partial call will be selected by an impartial lottery process in which the probability of your securities being selected for redemption is proportional to the holdings of all shareholders of such securities held in street name. If a security is called prior to maturity it may affect the yield you receive. Additional information is available at **www.wellsfargoadvisors.com** under Legal Disclosures or the written procedures are available upon request.

020 NG NG3J

**FERRANDO DIVERSIFIED
CAPITAL, LLC**

APRIL 1, 2022 - APRIL 30, 2022
ACCOUNT NUMBER: 5754-1611

**Cost basis - To add or update information or modify your reporting options, please contact Your Financial Advisor.**
This statement presents estimated unrealized or realized gains or losses for your information only. If acquisition or other information is not available, the gain/loss information may not be displayed and section and summary totals may not reflect your complete portfolio. Cost basis information is not verified by Wells Fargo Advisors and should not be relied upon for legal or tax purposes. Revisions to this information (due to corporate mergers, tenders and other reorganizations) may be required from time to time.

Cost basis for factored bonds (GNMA, CMO, etc.) will be adjusted for paydown of principal. Systematic investments in mutual funds and reinvested dividends for mutual funds and stocks have been consolidated for each position. Unit cost data for systematic investments and dividend reinvestment securities is provided for informational purposes only and is a non-weighted average.

Your account statement should not be used for tax preparation without assistance from your tax consultant. We do not report capital gains or losses for non-covered securities to the IRS.

Cost basis options
Unless specific tax lots are selected at trade time, sales of tax lots will occur using the cost basis election reflected in the Account profile section.

**Your Wealth Management Relationship Manager**
Your relationship manager listed is employed by Wells Fargo Bank, N.A. Wells Fargo affiliates may be paid a referral fee in relation to clients referred to Wells Fargo Bank, N.A. (WFB). WFB offers various advisory and fiduciary products and services. Financial Advisors of Wells Fargo Advisors, a separate non-bank affiliate, may refer clients to the bank for an ongoing or one-time fee. The role of the Financial Advisor with respect to bank products and services is limited to referral and relationship management services. WFB is responsible for the day-to-day management of any bank products and services and their related accounts.

**Estimated accrued interest on Fixed Income securities**
Estimated accrued interest is included in the Portfolio summary as a convenience to you and represents the estimated portion of the interest that would be received upon the sale of the Fixed Income positions in your account, calculated from the date of the last coupon (or dated date) through the date of the account statement, based upon information provided by the issuer. This is not a guarantee that this amount will be realized in your account. Actual income will be based upon the payout schedule of the securities held in your account. If you own a Foreign Fixed Income security, and it is denominated in a foreign currency, the Estimated accrued interest will not be accurate.

Case: 24-03003   Doc# 1   Filed: 01/08/24   Entered: 01/08/24 19:58:10   Page 21 of 56

020 NG NG3J

**EXHIBIT 2**

Case: 24-03003   Doc# 1   Filed: 01/08/24   Entered: 01/08/24 19:58:10   Page 22 of 56

# PROMISSORY NOTE

**$7,200,000.00**                                                      **July 29, 2022**

FOR VALUE RECEIVED, the undersigned, 201 EL CAMINO REAL LLC, a California limited liability company ("Maker"), promises to pay to the order of HU-HANTWO LLC, a California limited liability company ("Payee"), the sum of SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS ($7,200,000.00), together with interest thereon at the rate of seven and one-half percent (7.5%) per annum as follows: monthly payments in the amount of $45,000.00 each to Payee, or as otherwise directed by Payee via assignment or otherwise, commencing on March 1, 2023. All accrued and unpaid interest will be paid as part of the balloon payment at the Maturity Date (Defined Below), when the entire unpaid balance of principal and accrued and unpaid interest shall be due and payable.

**Payments.** All payments in respect of this Promissory Note (this "Note") shall be made in lawful money of the United States of America and paid to Payee by wire transfer on or before the payment due date pursuant to instructions to be provided to Maker by Payee, or such other place as shall be designated in writing by Payee for such purpose. Whenever any payment on this Note is due on a day that is not a business day in San Francisco, California ("Business Day"), such payment shall instead be made on the next Business Day.

**Maturity Date.** Any remaining outstanding balance of this Note together with any other monies owing under this Note, shall become fully due and payable by Maker to Payee upon the earliest to occur of the following (the "Maturity Date"):

    (a)    August 1, 2025; or

    (b)    The sale or other transfer of Maker's ownership interest in the real property commonly known as 201 El Camino Real, 612 Cambridge Avenue, Menlo Park, CA 94025 (the "Property").

**Voluntary Prepayments.** Maker shall have the right at any time and from time to time to prepay the amount of this Note in whole or in part, without premium or penalty.

**Representations and Warranties.** Maker hereby represents and warrants to Payee on the date of issuance of this Note that this Note constitutes the duly authorized, legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms.

**Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default":

    (a)    failure of Maker to pay any amount due under this Note and such default shall have continued for a period of ten (10) days after the date due; or

    (b)    Maker shall hereafter commence a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or an involuntary petition in any bankruptcy proceeding is filed against the Maker which is not dismissed and discharged within ninety days, or Maker shall consent to the conversion of an involuntary case to a voluntary case, under any such law, or a receiver, custodian, trustee or similar party is appointed for

1

all or a substantial part of its property; or Maker shall make an assignment for the benefit of creditors; or Maker shall be unable or fail, or shall admit in writing its inability, to pay its debts as such debts become due; or

        (c)    any representation or warranty made by Maker in this Note shall prove to have been incorrect in any material respect on or as of the date made.

**Remedies**.  Upon the occurrence of any Event of Default, Payee may, at its option, after notice in writing to Maker, declare the Note to be forthwith due and payable and thereupon the Note shall be and become due and payable (provided that if an Event of Default results from the filing of a voluntary petition in any bankruptcy proceeding or the filing of an involuntary petition in any bankruptcy proceeding which is not dismissed and discharged within ninety days, the Note thereupon shall immediately become due and payable without any notice from the holder of the Note or otherwise), and, the holder of the Note may take any action or proceeding at law or in equity which it deems advisable for the protection of its interests to collect and enforce payment of the Note, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Maker.

**Security**.  Maker's obligations under this Note are secured pursuant to the terms and provisions of a Collateral Pledge Agreement executed and delivered concurrently herewith by Ferrando Diversified Capital LLC.

**Miscellaneous**.

        (a)    No failure or delay on the part of Payee or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Maker and Payee shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that Payee would otherwise have.  No notice to or demand on Maker in any case shall entitle Maker to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Payee to any other or further action in any circumstances without notice or demand.

        (b)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

        (c)    After all amounts owed on this Note have been paid in full, this Note shall be surrendered to Maker for cancellation and shall not be reissued.

        (d)    This Note and the rights and obligations of Maker and Payee hereunder shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the State of California, without regard to conflicts of laws principles.

        (e)    If any legal action, arbitration or other proceeding is brought to enforce or interpret this Note, the substantially prevailing party will be entitled to recover reasonable attorneys'

DocuSign Envelope ID: 3DCF0EA1-5F70-469A-9984-A97A7EECC684

fees and other costs incurred in such action, arbitration or proceeding from the other party, in addition to any other relief to which such prevailing party is entitled.

      (f)    This Note is executed in connection with and as part of that certain Purchase Agreement for the Property entered into contemporaneously herewith by and between Payee, as seller, and Maker, as buyer, and together constitute the complete and exclusive statement of agreement and understanding of the parties with respect to the subject matter thereof, replacing and superseding all prior written or oral agreements, statements, correspondence, negotiations and understandings by and among the parties with respect to the matters covered thereby.

      (g)    No provision of this Note may be amended or modified except upon the written consent of both the Maker and Payee.

**IN WITNESS WHEREOF**, Maker has caused this Note to be executed and delivered as of the day and year first above written.

201 EL CAMINO REAL LLC

By: _____

Nariman Teymourian, Manager

7/30/2022

**EXHIBIT 3**

**AMENDED AND RESTATED**

**COLLATERAL PLEDGE AGREEMENT**

between

**FERRANDO DIVERSIFIED CAPITAL, LLC**

and

**HU-HANTWO LLC**

dated as of

June 5, 2023

506614433.5

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................................. 4

    Section 1.01 Definitions. .......................................................................................................... 4

    Section 1.02 Interpretation. ...................................................................................................... 7

    Section 1.03 Resolution of Drafting Ambiguities. .................................................................. 7

    Section 1.04 Schedules. ............................................................................................................ 8

ARTICLE II PLEDGE .................................................................................................................... 8

    Section 2.01 Pledge. ................................................................................................................. 8

    Section 2.02 Filings. ................................................................................................................. 8

    Section 2.03 Further Assurances. ............................................................................................. 8

ARTICLE III REPRESENTATIONS AND WARRANTIES ........................................................ 9

    Section 3.01 General. ................................................................................................................ 9

    Section 3.02 Ownership of Property and No Other Liens. ...................................................... 9

    Section 3.03 Perfected First Priority Security Interest. ......................................................... 10

    Section 3.04 Name, Jurisdiction of Organization, Etc. ......................................................... 10

    Section 3.05 Pledged Debt. .................................................................................................... 10

    Section 3.06 Pledged Collateral Information. ....................................................................... 10

ARTICLE IV COVENANTS ....................................................................................................... 10

    Section 4.01 Perfection of Certificated Securities Collateral. .............................................. 10

    Section 4.02 Maintenance of Perfected Security Interest. .................................................... 11

    Section 4.03 No Transfer of Pledged Collateral. .................................................................. 11

    Section 4.04 Claims Against Pledged Collateral. ................................................................. 11

    Section 4.05 Other Financing Statements. ............................................................................ 11

    Section 4.06 Changes in Name, Jurisdiction of Organization, Etc. ...................................... 11

    Section 4.07 Approvals. ......................................................................................................... 12

    Section 4.08 Compliance With Laws. ................................................................................... 12

ARTICLE V LIQUIDATION, RECAPITALIZATION, ETC. .................................................... 12

    Section 5.01 Existing Voting Rights and Distributions. ....................................................... 12

ARTICLE VI REMEDIES ........................................................................................................... 13

506614433.5

Section 6.01 Remedies. ..................................................................................................... 13

Section 6.02 Sale of Pledged Collateral. ........................................................................... 14

Section 6.03 Private Sales. ................................................................................................ 15

Section 6.04 No Waiver and Cumulative Remedies. ......................................................... 15

Section 6.05 Grantor' Agreements. ................................................................................... 16

Section 6.06 Application of Proceeds. ............................................................................... 16

ARTICLE VII MISCELLANEOUS ............................................................................................... 16

Section 7.01 Performance By Secured Party. ................................................................... 16

Section 7.02 Power of Attorney. ....................................................................................... 17

Section 7.03 Continuing Security Interest and Assignment. ............................................. 17

Section 7.04 Termination and Release. ............................................................................. 17

Section 7.05 Modification in Writing. ................................................................................ 17

Section 7.06 Notices. ......................................................................................................... 18

Section 7.07 Indemnity and Expenses. ............................................................................. 18

Section 7.08 Suretyship Waivers. ..................................................................................... 19

Section 7.09 Governing Law, Consent to Jurisdiction, Waiver of Jury Trial and Judicial Reference
Provision. ........................................................................................................................... 21

Section 7.10 Severability of Provisions. ............................................................................ 22

Section 7.11 Counterparts; Integration; Effectiveness. .................................................... 22

Section 7.12 No Release. ................................................................................................... 23

Section 7.13 Amendment and Restatement; No Novation. ............................................... 23

506614433.5

**AMENDED AND RESTATED COLLATERAL PLEDGE AGREEMENT**

This AMENDED AND RESTATED COLLATERAL PLEDGE AGREEMENT, dated as of June 5, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**") is made by and among FERRANDO DIVERSIFIED CAPITAL, LLC, a California limited liability company (the "**Grantor**"), in favor of HU-HANTWO LLC, a California limited liability company (the "**Secured Party**") with reference to the following facts and recitals:

A.      On July 28, 2022, 201 El Camino Real LLC (the "**Borrower**") executed and delivered to the Secured Party that certain Promissory Note in the principal amount of $7,2000,000 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"); capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Note.

B.      In order to induce the Secured Party to accept the Note, Grantor executed and delivered that certain Collateral Pledge Agreement dated as of July 28, 2022 (the "**Existing Pledge Agreement**") by and between the Grantor and the Secured Party.

C.      Nariman Teymourian is the sole member of both the Borrower and the Grantor.

D.      An "Event of Default" has occurred and is continuing under the Note as a result of Borrower's failure to make monthly payments are required thereunder.

E.      It is a condition to the agreement of the Secured Party to forbear from exercising remedies under the Existing Pledge Agreement as set forth in that certain Forbearance Agreement of even date herewith (the "**Forbearance Agreement**") among the Borrower, the Grantor and the Secured Party, that the Grantor execute and deliver this Agreement.

F.      The Grantor will receive substantial direct and indirect benefits from the execution, delivery and performance of the obligations under the Forbearance Agreement and is, therefore, willing to enter into this Agreement.

G.      This Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations.

H.      It is the intent of the parties hereto that this Agreement not constitute a novation of the liabilities and obligations existing under the Existing Pledge Agreement, which shall remain outstanding, and that this Agreement amend and restate in its entirety the Existing Pledge Agreement.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Secured Party hereby agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.01   Definitions.**

(a)     Unless otherwise defined herein or in the Note, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(b)     The following terms shall have the following meanings:

"**Agreement**" has the meaning set forth in the Preamble hereof.

"**Borrower**" has the meaning set forth in the Recitals hereof.

"**Claims**" means any and all property and other taxes, assessments and special assessments, levies, fees and all governmental charges imposed upon or assessed against, and landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law against, all or any portion of the Pledged Collateral.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Control Agreement**" means that certain Notice and Control Agreement dated on or about the date hereof among the Grantor, the Secured Party, Nariman Teymourian, and the Custodian, as amended, restated, supplemented or otherwise modified from time to time.

"**Custodian**" means Bank of Utah.

"**Custodian Account**" means account number 6043038 maintained with the Custodian in the name of the Grantor and Nariman Teymourian.

"**Distributions**" means, collectively, with respect to the Grantor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Debt, from time to time received, receivable or otherwise distributed or distributable to the Grantor in respect of or in exchange for any or all of the Pledged Debt.

"**Event of Default**" means the occurrence of any one of the following events:

(a) The Borrower's failure to pay or discharge the "Obligations" in accordance with the terms of, and as defined in, the Note;

(b) The occurrence of an Event of Default under, and as defined in, the Note;

Case: 24-03003   Doc# 1   Filed: 01/08/24   Entered: 01/08/24 19:58:10   Page 31 of 56

(c) Default in the performance of any obligation or covenant contained in this Agreement or the Forbearance Agreement;

(d) Any warranty, representation, or statement made by the Grantor herein proves to have been false in any material respect when made; and

(e) Death, dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the Pledged Collateral, assignment for the benefit of creditors by, or commencement of any proceeding under any bankruptcy or insolvency laws by or against the Grantor.

"**First Priority**" means, with respect to any Lien purported to be created in any Pledged Collateral pursuant to this Agreement, such Lien is the most senior Lien to which such Pledged Collateral is subject.

"**Forbearance Agreement**" has the meaning set forth in the Recitals hereto.

"**Grantor**" has the meaning set forth in the Preamble hereof.

"**Indemnitee**" has the meaning set forth in Section 7.07.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, collateral assignment, charge or deposit arrangement, encumbrance, lien (statutory or other) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever.

"**Note**" has the meaning set forth in the Recitals hereto.

"**Organizational Documents**" means the certificate of incorporation and by-laws or any comparable formation documents of any business entity (including limited liability companies and partnerships).

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or governmental authority or other form of entity.

"**Pledged Collateral**" has the meaning set forth in Section 2.01.

"**Pledged Debt**" means, (i) those certain corporate bonds of Clear TV Media USA, CPN 5.750%, Due 6/30/29, CUSIP 18468TAB9, having an aggregate market value of Fifteen Million Dollars ($15,000,000.00) and (ii) all interest, cash, instruments and other property, assets or proceeds from time to time received, receivable or otherwise distributed or distributable in respect of or in exchange for any or all of such bonds and all certificates, instruments or agreements evidencing such bonds, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"**Secured Obligations**" means (i) obligations of the Borrower and the Grantor from time to time arising under the Note, this Agreement, the Forbearance Agreement, or any other document executed or delivered in connection with any of the foregoing or otherwise with respect to the due and prompt payment of (A) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Note, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (B) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary or secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower and the Grantor under or in respect of the Note, this Agreement, the Forbearance Agreement, or any other document executed or delivered in connection with any of the foregoing, and (ii) the due and prompt performance of all other covenants, duties, debts, obligations and liabilities of any kind of the Borrower and the Grantor, individually or collectively, under or in respect of the Note, this Agreement, the Forbearance Agreement, or any other document executed or delivered in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary or secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise.

"**Secured Party**" has the meaning set forth in the Preamble hereof.

"**Securities Collateral**" means, collectively, the Pledged Debt and the Distributions.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of California; provided, however, that if by reason of mandatory provisions of law, any or all of the perfection or priority of the Secured Party's security interest in any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, the term "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

**Section 1.02  Interpretation.** All references in this Agreement to Sections are references to Sections of this Agreement unless otherwise specified. All references in this Agreement to Schedules and Exhibits are references to Schedules and Exhibits of this Agreement unless otherwise specified.

**Section 1.03  Resolution of Drafting Ambiguities.** The Grantor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of this

Agreement, that it and its counsel reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party (i.e., the Secured Party) shall not be employed in the interpretation of this Agreement.

Section 1.04   **Schedules.** The Secured Party and the Grantor agree that the Schedules hereto, all descriptions of Pledged Collateral contained in the Schedules and all amendments and supplements thereto are and shall at all times remain a part of this Agreement.

## ARTICLE II
## PLEDGE

Section 2.01   **Pledge.** As collateral security for the payment and performance in full of all the Secured Obligations, the Grantor hereby pledges and assigns to the Secured Party, and grants to the Secured Party, a Lien on and security interest in and to, all of the right, title and interest of the Grantor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "**Pledged Collateral**"):

(a)   all Securities Collateral; and

(b)   to the extent not covered by clause (a) of this sentence, all proceeds and products of each of the foregoing, all books and records at any time evidencing or relating to any of the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

Section 2.02   **Filings.** The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article or Division 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral without the signature of the Grantor where permitted by law. The Grantor agrees to provide all necessary information related to such filings to the Secured Party promptly upon request by the Secured Party.

Section 2.03   **Further Assurances.** The Grantor shall take such further actions, and execute and/or deliver to the Secured Party such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, and will obtain such governmental consents and corporate approvals and will cause to be done all such other things, as the Secured Party may in its judgment deem necessary or appropriate in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted in the Pledged Collateral as provided herein and the rights and interests granted to the Secured Party hereunder, and enable the Secured Party to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of any financing statements, continuation statements and other documents under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interest created

hereby, all in form satisfactory to the Secured Party and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Secured Party hereunder, as against third parties, with respect to the Pledged Collateral. With respect to all Pledged Collateral of a Grantor over which the Secured Party may obtain "control" within the meaning of section 8-106 of the UCC, the Grantor shall take all actions as may be requested from time to time by the Secured Party so that control of such Pledged Collateral is obtained and at all times held by the Secured Party. Without limiting the generality of the foregoing, but subject to applicable law, the Grantor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Secured Party from time to time upon request by the Secured Party such lists, schedules, descriptions and designations of the Pledged Collateral, statements, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Secured Party shall reasonably request. If an Event of Default has occurred and is continuing, the Secured Party may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Secured Party may deem necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral. All of the foregoing shall be at the sole cost and expense of the Grantor.

**Section 2.04   Custodian.**   Until this Agreement is terminated in accordance with Section 7.04, the Grantor shall (i) maintain the Pledged Debt in the custody of the Custodian in the Custodian Account at all times, (ii) cause the Pledged Debt not to be withdrawable from the Custodian Account without the written consent of the Secured Party and (iii) shall cause the Custodian Account and the Pledged Debt to be subject to the Control Agreement at all times.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES

The Grantor represents and warrants as follows:

**Section 3.01   General.** Grantor has the full power and authority to execute, deliver, and perform under this Agreement and to pledge the Pledged Collateral hereunder. This Agreement constitutes the valid and binding obligation of the Grantor, enforceable in accordance with its terms, and the pledge of the Pledged Collateral referred to herein is not in violation of and shall not create any default under any agreement, undertaking or obligation of the Grantor.

**Section 3.02   Ownership of Property and No Other Liens.**

(a)    The Grantor is the sole, direct, legal and beneficial owner of all Securities Collateral, and has good and marketable title to all its Pledged Collateral, and none of such property is subject to any Lien, claim, option or right of others. No Person other than the Secured Party has control or possession of all or any part of the Pledged Collateral.

(b)    The Grantor has not executed or filed, or authorized any third party to file, any financing statement or other instrument similar in effect covering all or any part of

the Pledged Collateral or listing the Grantor as debtor in any recording office, except those that have been filed in favor of the Secured Party. No financing statement or other instrument similar in effect covering all or any part of the Pledged Collateral or listing the Grantor as debtor is on file in any recording office, except those that have been filed in favor of the Secured Party.

**Section 3.03    Perfected First Priority Security Interest.**

(a)    All certificates, agreements, promissory notes or instruments representing or evidencing the Securities Collateral in existence on the date hereof have been delivered to the Custodian in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank and (assuming continuing possession by the Custodian of all such Securities Collateral) the Secured Party has a perfected First Priority security interest therein.

(b)    The Secured Party has a perfected First Priority security interest in all Securities Collateral that are uncertificated securities pledged by it hereunder that are in existence on the date hereof.

(c)    This Agreement is effective to create in favor of the Secured Party a legal, valid and enforceable security interest in the Pledged Collateral and the proceeds thereof. All filings and other actions necessary or appropriate to perfect the security interest in the Pledged Collateral granted by the Grantor hereunder have been duly made or taken and are in full force and effect; and such security interest is First Priority.

**Section 3.04    Name, Jurisdiction of Organization, Etc.** The Grantor is a California limited liability company.  Its exact legal name is indicated on the signature page hereto.  Its chief executive office or principal place of business are indicated in Section 7.06 hereof.

**Section 3.05    Pledged Debt.** All of the Pledged Debt has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuer thereof, enforceable in accordance with its terms (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law)) and is not in default.

**Section 3.06    Pledged Collateral Information.** All information set forth herein relating to the Pledged Collateral, is accurate and complete.

**ARTICLE IV**
**COVENANTS**

The Grantor covenants as follows:

**Section 4.01    Perfection of Certificated Securities Collateral.** The Grantor hereby agrees that all certificates, agreements, promissory notes or instruments representing or evidencing the Securities Collateral acquired by the Grantor after the date hereof, shall

immediately upon receipt thereof by the Grantor be held by or on behalf of and delivered to the Custodian or the Secured Party in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

The Secured Party shall have the right, at any time, to endorse, assign or otherwise transfer to or to register in the name of the Secured Party or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder. In addition, at any time/upon the occurrence and during the continuance of an Event of Default, the Secured Party shall have the right to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations.

**Section 4.02   Maintenance of Perfected Security Interest.** The Grantor shall, at its sole cost and expense, maintain the security interest created by this Agreement in the Pledged Collateral as a perfected First Priority security interest.

**Section 4.03   No Transfer of Pledged Collateral.** The Grantor shall not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any Lien on, any of the Pledged Collateral pledged by it hereunder or any interest therein.

**Section 4.04   Claims Against Pledged Collateral.** The Grantor shall, at its own cost and expense, defend title to the Pledged Collateral and the First Priority security interest and Lien granted to the Secured Party with respect thereto against all claims and demands of all Persons at any time claiming any interest therein adverse to the Secured Party. There is no agreement, order, judgment or decree, and the Grantor shall not enter into any agreement or take any other action, that could restrict the transferability of any of the Pledged Collateral or otherwise impair or conflict with the Grantor's obligations or the rights of the Secured Party hereunder.

**Section 4.05   Other Financing Statements.** No Grantor shall execute, authorize or permit to be filed in any recording office any financing statement or other similar instrument covering all or any part of the Pledged Collateral or listing the Grantor as debtor with respect to all or any part of the Pledged Collateral.

**Section 4.06   Changes in Name, Jurisdiction of Organization, Etc.** The Grantor shall not, except upon not less than thirty (30) days' prior written notice to the Secured Party, and delivery to the Secured Party of all additional financing statements, information and other documents reasonably requested by the Secured Party to maintain the validity, perfection and priority of the security interests provided for herein:

(a)   change its legal name, identity, type of organization or corporate structure;

(b)   change the location of its chief executive office or its principal place of business; or

(c)     change its jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, organizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction).

The Grantor shall, prior to any change described in the preceding sentence, take all actions requested by the Secured Party to maintain the perfection and priority of the security interest of the Secured Party in the Pledged Collateral intended to be granted hereunder.

The Grantor agrees to promptly provide the Secured Party with certified Organizational Documents reflecting any of the changes described in this Section 4.06. The Grantor will (A) keep and maintain at its own cost and expense at its principal place of business satisfactory and complete records of the Pledged Collateral, including a record of all payments received and all other dealings of a material nature with the Pledged Collateral, and (B) mark its books and records pertaining to the Pledged Collateral and its books and records kept in its jurisdiction of organization to evidence this Agreement and the Liens and security interests granted hereby. The Grantor also agrees to promptly notify the Secured Party of any change in the location of any office in which it maintains books or records relating to Pledged Collateral owned by it or any office or facility at which Pledged Collateral is located (including the establishment of any such new office or facility).

**Section 4.07   Approvals.** In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any governmental authority or any other Person therefor, then, upon the request of the Secured Party, the Grantor agrees to assist the Secured Party in obtaining as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

**Section 4.08   Compliance With Laws.** The Grantor shall pay promptly when due all Claims upon the Pledged Collateral or incurred in connection with the use or operation of the Pledged Collateral or incurred in connection with this Agreement. The Grantor shall comply with all requirements of law applicable to the Pledged Collateral and perform and observe its duties and obligations under the Organizational Documents applicable to it.

**ARTICLE V**
**LIQUIDATION, RECAPITALIZATION, ETC.**

**Section 5.01   Existing Voting Rights and Distributions.**

(a)     Except as set forth in the Forbearance Agreement, so long as no Event of Default shall have occurred and be continuing:

(i)     The Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the Note, or any other document or agreement executed or delivered in connection therewith.

506614433.5

(ii)     The Grantor shall be entitled to receive and retain, free and clear of the Lien hereof, any and all Distributions; provided, however, that any and all (A) non-cash Distributions paid, received or otherwise distributed in respect of, or in exchange for, any Securities Collateral, and (B) cash paid or otherwise distributed in respect of principal, or redemption of, or in exchange for, any Securities Collateral, shall be immediately delivered to the Secured Party for application to Secured Obligations and shall, if received by the Grantor, be received in trust for the benefit of the Secured Party, be segregated from the other property or funds of the Grantor and be immediately delivered to the Secured Party in the same form as so received (with any necessary endorsement).

(b)     Upon the occurrence and during the continuance of any Event of Default:

(i)     All rights of the Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 5.01(a)(i) shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to exercise such voting and other consensual rights.

(ii)     All rights of the Grantor to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 5.01(a)(ii) shall immediately cease and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to receive and hold such Distributions for application to the Secured Obligations.

(c)     The Grantor shall, at its sole cost and expense, from time to time execute and deliver to the Secured Party appropriate instruments as the Secured Party may request in order to permit the Secured Party to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 5.01(b)(i) and to receive all Distributions which it may be entitled to receive under Section 5.01(b)(ii).

(d)     All Distributions which are received by any Grantor contrary to the provisions of Section 5.01(a)(ii) or Section 5.01(b) shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of the Grantor and shall immediately be paid over to the Secured Party for application to the Secured Obligations in the same form as so received (with any necessary endorsement).

## ARTICLE VI
## REMEDIES

**Section 6.01   Remedies.** If any Event of Default shall have occurred and be continuing, the Secured Party may exercise, without any other notice to or demand upon any Grantor, in addition to the other rights and remedies provided for herein or the Note or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Pledged Collateral) and also may:

(i)    (A) exercise any voting rights relating to the Pledged Collateral (whether or not the same shall have been transferred into its name or the name of its nominee) for any lawful purpose, (B) give all consents, waivers, approvals, and ratifications in respect of such Pledged Collateral, (C) receive all amounts payable in respect of the Pledged Collateral otherwise payable under Section 5.01(a)(ii) to the Grantor, (D) exercise any and all rights and remedies of the Grantor under or in connection with the Pledged Collateral, and (E) otherwise act with respect to the Pledged Collateral as though it were the outright owner thereof (the Grantor hereby irrevocably constituting and appointing the Secured Party the proxy and attorney-in-fact of the Grantor, with full power and authority of substitution, to do so);

(ii)    demand, sue for, collect, compromise, or settle any rights or claims in respect of any Pledged Collateral, as attorney-in-fact pursuant to Section 7.02 or otherwise/as the Secured Party deems suitable;

(iii)    without notice except as specified below and without demand for performance by the Grantor, sell, resell, assign and deliver or grant a license to use or otherwise dispose of the Pledged Collateral or any part thereof, in one or more parcels at public or private sale, at any of the Secured Party's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable;

(iv)    cause all or any part of the Pledged Collateral to be transferred into its name or the name of its nominee; and

(v)    accelerate any Pledged Debt which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Pledged Debt (including, without limitation, to make any demand for payment thereon).

**Section 6.02   Sale of Pledged Collateral.** In the event of any sale or other disposition of the Pledged Collateral as provided in ARTICLE VI, unless the Pledged Collateral threatens to decline speedily in value, the Secured Party shall give to the Grantor at least ten (10) days' prior notice of the time and place of any public sale or other disposition of the Pledged Collateral or the time after which any private sale or any other disposition is to be made. The Grantor hereby acknowledges that ten (10) days' prior notice of such sale or other disposition shall be reasonable notice. The Secured Party may enforce its rights hereunder without any other notice and without any other action now or hereafter required by law, regulation, judicial order or decree or otherwise (all of which are hereby expressly waived by the Grantor, to the fullest extent permitted by law). The Secured Party may buy any part or all of the Pledged Collateral at any public sale or other disposition and if any part or all of the Pledged Collateral is of a type customarily sold or otherwise disposed of in a recognized market or is of a type which is the subject of widely-distributed standard price quotations, the Secured Party may buy at any private sale or other disposition and may make payments thereof by any means. At any sale of the Pledged Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Pledged Collateral or any part thereof and shall be entitled,

for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable at such sale. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Pledged Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Pledged Collateral and any other security for the Secured Obligations or otherwise. The Secured Party shall not be liable for failure to collect or realize upon any or all of the Pledged Collateral or for any delay in so doing nor shall it be under any obligation to take any action with regard thereto.

**Section 6.03  Private Sales.** The Grantor recognizes that the Secured Party may be unable to effect a public sale or other disposition of the Pledged Collateral due to the lack of a ready market for the Pledged Collateral, a limited number of potential buyers of the Pledged Collateral or certain prohibitions contained in the Securities Act, state securities laws, and other applicable laws, and that the Secured Party may be compelled to resort to one or more private sales or other dispositions thereof to a restricted group of purchasers. The Grantor agrees that such private sales or other dispositions may be at prices and other terms less favorable to the seller than if sold at public sales or other dispositions and that such private sales or other dispositions shall not solely by reason thereof be deemed not to have been made in a commercially reasonable manner. The Secured Party shall be under no obligation hereunder or otherwise (except as provided by applicable law) to delay a sale or other disposition of any of the Pledged Collateral for the period of time necessary to permit the registration of such securities for public sale or other public disposition under the Securities Act and applicable state securities laws. Any such sale or other disposition of all or a portion of the Pledged Collateral may be for cash or on credit or for future delivery and may be conducted at a private sale or other disposition where the Secured Party or any other Person or entity may be the purchaser of all or part of the Pledged Collateral so sold or otherwise disposed of. The Grantor agrees that to the extent notice of sale or other disposition shall be required by law, at least ten (10) days' prior notice to the applicable Grantor of the time and place after which any private sale is to be made shall constitute reasonable notification. Subject to the foregoing, the Secured Party agrees that any sale or other disposition of the Pledged Collateral shall be made in a commercially reasonable manner. The Secured Party shall incur no liability as a result of the sale or other disposition of any of the Pledged Collateral, or any part thereof, at any private sale which complies with the requirements of this ARTICLE VI. The Grantor hereby waives, to the extent permitted by applicable law, any claims against the Secured Party arising by reason of the fact that the price at which any of the Pledged Collateral, or any part thereof, may have been sold or otherwise disposed of at such private sale was less than the price that might have been obtained at a public sale or other public disposition, even if the Secured Party accepts the first offer deemed by the Secured Party on good faith to be commercially reasonable under the circumstances and does not offer any of the Pledged Collateral to more than one offeree.

**Section 6.04  No Waiver and Cumulative Remedies.** No failure on the part of the Secured Party to exercise, no course of dealing with respect to, and no delay on the part of the Secured Party in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Secured Party be required to look first to, enforce or exhaust

any other security, collateral or guaranties. Neither the Secured Party not any other Secured Party shall by any act (except by a written instrument pursuant to Section 7.05), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

**Section 6.05   Grantor's Agreements.**

(a)     If the Secured Party determines to exercise its right to sell all or any of the Pledged Collateral of any Grantor pursuant to ARTICLE VI, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense:

(i)     provide the Secured Party with such information as may be necessary or, in the opinion of the Secured Party, advisable to enable the Secured Party to effect the sale of such Pledged Collateral; and

(ii)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Pledged Collateral valid and binding and in compliance with all applicable requirements of law.

(b)     To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waive presentment, notice of dishonor, and protest of all instruments included in or evidencing any of the Secured Obligations or the Pledged Collateral, and any and all other notices and demands whatsoever (except as expressly provided herein).

**Section 6.06   Application of Proceeds.** Upon the exercise by the Secured Party of its remedies hereunder, any proceeds received by the Secured Party in respect of any realization upon any Pledged Collateral shall be applied in accordance with the Note. The Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Pledged Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

# ARTICLE VII
# MISCELLANEOUS

**Section 7.01   Performance By Secured Party.** If the Grantor shall fail to perform any covenants contained in this Agreement (including covenants to pay insurance, taxes and claims arising by operation of law in respect of the Pledged Collateral and to pay or perform any Grantor obligations under any Pledged Collateral) or if any representation or warranty on the part of any Grantor contained herein shall be breached, the Secured Party may (but shall not be obligated to) during the existence of an Event of Default do the same or cause it to be done or remedy any such breach, and may make payments for such purpose; provided, however, that the Secured Party shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which the Grantor fails to pay or perform as and when required hereby. Any and all amounts so paid by the Secured Party shall be reimbursed by the Grantor in accordance

with the provisions of Section 7.07. Neither the provisions of this Section 7.01 nor any action taken by the Secured Party pursuant to the provisions of this Section 7.01 shall prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default.

Section 7.02   Power of Attorney[1]. The Grantor hereby appoints the Secured Party its attorney-in-fact, with full power and authority in the place and stead of the Grantor and in the name of the Grantor, or otherwise, from time to time during the existence of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument or document consistent with the terms of the Note, this Agreement and the other documents and agreements executed or delivered in connection therewith which the Secured Party may deem necessary or advisable to accomplish the purposes hereof (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

Section 7.03   Continuing Security Interest and Assignment. This Agreement shall create a continuing security interest in the Pledged Collateral and shall (a) be binding upon the Grantor, its successors and assigns and (b) inure, together with the rights and remedies of the Secured Party hereunder, and its successors, transferees and assigns and their respective officers, directors, employees, affiliates, agents, advisors and controlling Persons; provided that, the Grantor shall not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party and any attempted assignment or transfer without such consent shall be null and void. Without limiting the generality of the foregoing clause (b), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party, herein or otherwise, subject however, to the provisions of the Note.

Section 7.04   Termination and Release. At such time as the Secured Obligations have been paid in full (other than contingent indemnification obligations in which no claim has been made or is reasonably foreseeable), the Pledged Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Secured Party and the Grantor hereunder shall terminate, all without delivery of any instrument or any further action by any party, and all rights to the Pledged Collateral shall revert to the Grantor. At the request and sole expense of the Grantor following any such termination, the Secured Party shall deliver to the Grantor any Pledged Collateral held by the Secured Party hereunder, and execute and deliver to the Grantor any documents that the Grantor shall reasonably request to evidence such termination.

Section 7.05   Modification in Writing. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective, except by a written instrument signed by the Secured Party. Any amendment, modification or supplement of any provision hereof, any

_____

[1] [May require a notarized document.]

506614433.5

waiver of any provision hereof and any consent to any departure by the Grantor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given.

**Section 7.06   Notices.**   Unless otherwise provided herein, any notice or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been validly served, given or delivered (i) three (3) business days after deposit in the United States mails, with proper postage prepaid, (ii) one (1) business day after deposited with a reputable overnight courier with all charges prepaid, or (iii) when delivered, if hand-delivered by messenger, all of which shall be properly addressed to the party to be notified and sent to the address indicated as follows:

If to Grantor, at:

> 66 Barry Lane
> Atherton, CA  94207
> Attention: Nariman Teymourian

If to the Secured Party, at:

> 86 Michaels Way
> Atherton, CA 94027
> Attention: Yihan Hu

with a copy (which shall not constitute notice for any purpose hereunder) to:

> K&L Gates LLP
> 10100 Santa Monica Blvd., Suite 800
> Los Angeles, CA 90067
> Attention:  Michael Lubic

**Section 7.07   Indemnity and Expenses.**

(a)    The Grantor hereby agrees to indemnify and hold harmless the Secured Party (and any sub-agent thereof), and the members, managers, officers, directors, employees, attorneys and agents (each, a "**Related Party**") of the Secured Party (each such Person being called an "**Indemnitee**") from any losses, damages, liabilities, claims and related expenses (including the fees and expenses of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Grantor or the Borrower) other than such Indemnitee and its Related Parties arising out of, in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement) or any failure of any Secured Obligations to be the legal, valid, and binding obligations of the Grantor enforceable against the Grantor in accordance with their terms, whether brought by a third party or by the Grantor or the Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be

506614433.5

available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(b)     To the fullest extent permitted by applicable law, the Grantor hereby agrees not to assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, or the transactions contemplated hereby.

(c)     The Grantor agrees to pay or reimburse the Secured Party for all its costs and expenses incurred in collecting against the Grantor its Secured Obligations or otherwise protecting, enforcing or preserving any rights or remedies under this Agreement, including the fees and other charges of counsel to the Secured Party.

(d)     All amounts due under this Section shall be payable promptly after demand therefor, shall constitute Secured Obligations and shall bear interest until paid at a rate per annum equal to the highest rate per annum at which interest would then be payable under the Note.

(e)     Without prejudice to the survival of any other agreement of the Grantor under this Agreement, the agreements and obligations of the Grantor contained in this Section shall survive termination of this Agreement and payment in full of the Secured Obligations and all other amounts payable under this Agreement.

**Section 7.08     Suretyship Waivers.** The Grantor absolutely, unconditionally, knowingly, and expressly waives:

(a)     its right, under Sections 2845 or 2850 of the California Civil Code, or otherwise, to require the Secured Party to institute suit against, or to exhaust any rights and remedies which the Secured Party has or may have against, the Borrower or any third party, or against any collateral for the Secured Obligations provided by the Borrower or any third party. The Grantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Secured Obligations shall have been fully and finally performed and indefeasibly paid) of the Borrower or any other guarantor or by reason of the cessation from any cause whatsoever of the liability of the Borrower or any guarantors in respect thereof.

(b)     (1) any rights to assert against the Secured Party any defense (legal or equitable), set-off, counterclaim, or claim which the Grantor may now or at any time hereafter have against the Borrower or any other party liable to the Secured Party; (2) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Secured Obligations or any security therefor; (3) any defense the Grantor has to performance hereunder, and any right the Grantor has to be exonerated, provided by Sections 2819, 2822, or 2825 of the California Civil Code, or otherwise,

arising by reason of: the impairment or suspension of the Secured Party's rights or remedies against the Borrower; the alteration by the Secured Party of the Secured Obligations; any discharge of the Borrower's obligations to the Secured Party by operation of law as a result of the Secured Party's intervention or omission; or the acceptance by the Secured Party of anything in partial satisfaction of the Secured Obligations; and (4) the benefit of any statute of limitations affecting the Borrower's liability under the Note or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Secured Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to the Grantor's liability hereunder.

(c)     The Grantor absolutely, unconditionally, knowingly, and expressly waives any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by the Secured Party including any defense based upon an election of remedies by the Secured Party under the provisions of Sections 580a, 580b, 580d, and 726 of the California Code of Civil Procedure or any similar law of California or any other jurisdiction; or (ii) any election by the Secured Party under Section 1111(b) of the Bankruptcy Code to limit the amount of, or any collateral securing, its claim against the Borrower. Pursuant to California Civil Code Section 2856(b), the Grantor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Grantor's rights of subrogation and reimbursement against the Borrower by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(d)     The Grantor hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right of subrogation the Grantor has or may have as against the Borrower with respect to the Secured Obligations; (ii) any right to proceed against the Borrower or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which the Grantor may now have or hereafter have as against the Borrower with respect to the Secured Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of the Borrower.

(e)     WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS AGREEMENT, THE GRANTOR HEREBY ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES AND AGREES NOT TO ASSERT ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580c, 580d, AND 726, CALIFORNIA UNIFORM COMMERCIAL CODE SECTIONS 3116, 3118, 3119, 3419, 3605, 9504, 9505, AND 9507, AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

(f)     The Grantor warrants and agrees that each of the waivers set forth above is made with the Grantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Section 7.09   Governing Law, Consent to Jurisdiction and Waiver of Jury Trial and Judicial Reference Provision.**

(a)     This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of California.

(b)     The Grantor hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court or any United States federal court sitting in San Mateo County, California. The Grantor hereby irrevocably waives, to the fullest extent permitted by law, any objection that the Grantor may now or hereafter have to the laying of venue in any such court and any claim that any such court is an inconvenient forum. The Grantor hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any state court or any United States federal court sitting in California may be made by certified or registered mail, return receipt requested, directed to the Grantor at its address for notice set forth in Section 7.06, or at a subsequent address of which the Secured Party received actual notice from the Grantor in accordance with Section 7.06, and service so made shall be complete five (5) days after the same shall have been so mailed. Nothing herein shall affect the right of the Secured Party to serve process in any manner permitted by law or limit the right of the Secured Party to bring proceedings against the Grantor in any other court or jurisdiction.

(c)     THE GRANTOR AND THE SECURED PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SECURED PARTY ENTERING INTO THIS AGREEMENT.

(d)     <u>Judicial Reference Provision</u>. In the event the jury trial waiver set forth in clause (c) above is not enforceable, the parties elect to proceed under this "Judicial Reference Provision".

(i)     If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private

judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

(ii)        (b)        The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**Section 7.10   Severability of Provisions.** Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

**Section 7.11   Counterparts; Integration; Effectiveness.** This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. This Agreement and the other documents or agreements executed or delivered in connection herewith constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and

understandings, oral or written, with respect thereto. This Agreement shall become effective when it shall have been executed by the Secured Party and when the Secured Party shall have received a counterpart hereof signed by the Grantor. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf", "tif" or "DocuSign") format shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA, including the New York Electronic Signatures and Records Act (N.Y. Tech. §§ 301 to 309).

**Section 7.12    No Release.** Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights or remedies hereunder, shall relieve the Grantor from the performance of any term, covenant, condition or agreement on the Grantor's part to be performed or observed in respect of any of the Pledged Collateral or from any liability to any Person in respect of any of the Pledged Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Grantor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of the Grantor relating thereto or for any breach of any representation or warranty on the part of the Grantor contained in this Agreement or in respect of the Pledged Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, the Secured Party shall not have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral. The obligations of the Grantor contained in this Section 7.12 shall survive the termination hereof and the discharge of the Grantor's other obligations under this Agreement.

**Section 7.13    Amendment and Restatement; No Novation.** This Agreement constitutes an amendment and restatement of the Existing Pledge Agreement effective from and after the date hereof. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby are not intended by the parties to be, and shall not constitute, a novation or an accord and satisfaction of the obligations owing to the Secured Party under the Existing Pledge Agreement. Each of the parties hereto hereby acknowledges and agrees that the pledge and grant of the security interests in the Pledged Collateral pursuant hereto is not intended to, nor shall it be construed to be, a release of any prior pledge or security interests granted by the Grantor in favor of the Secured Party under the Existing Pledge Agreement, but is intended to constitute a restatement and reconfirmation of the prior pledge and security interests granted by Grantor in favor of the Secured Party.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

FERRANDO DIVERSIFIED CAPITAL, LLC, as Grantor

By_____

Name: Nariman Tcymourian

Title: Manager

HU-HANTWO LLC, as Secured Party

By_____

Name: Yihan Hu

Title: Manager

506614433.5

**EXHIBIT 4**



June 16, 2022

Yihan Hu
Hu-Hantwo, LLC
c/o Roxane Chiang (Giant Realty), Don Sung (Colliers)

**Subject Property:**
201 El Camino Real (Commercial Property & Parking Lot) – 2 Parcels
612 Cambridge Ave (Multifamily Property) – 1 Parcel
Menlo Park, CA 94025

**Current Vesting of Subject Property:  Hu-Hantwo, LLC**
**Subject Property - 3 APN's:**
**071-413-200:  201 El Camino Real, Menlo Park, CA 94025 (Commercial Property)**
**071-413-370:  201 El Camino Real, Menlo Park, CA 94025 (Parking Lot)**
**071-413-380:  612 Cambridge Ave, Menlo Park, CA 94025 (Multifamily Property)**

Re:      **Seller Carry Loan Agreement for Above-Referenced Properties**

Dear Ms. Chiang & Mr. Sung,

The purpose of this letter is to outline the general terms and conditions under which Hu-Hantwo, LLC ("Seller") would provide Nariman Teymourian and/or Assigns ("Buyer") a Seller Carry Loan of $5 Million Towards the Purchase and Sale of the above-referenced property ("Subject Property").

1.  **Seller Carry Loan Amount:**
    At Close of Escrow, Seller agrees to carry a $5 Million ($5,000,000) Loan ("Seller Carry Loan"), (or an amount no higher than $6 Million as mutually agreed by Buyer and Seller), provided that the Seller Carry Loan shall be personally guaranteed and secured against (as collateral) a Wells Fargo Wealth Management Account ("Buyer Bond Fund Account") held under Ferrando Diversified Capital, LLC (with a Total Account Asset Value of $157,628,858.32 as of April 30, 2022).  The portion of the Buyer Bond Fund Account used as collateral to guarantee repayment of the Seller Carry Loan shall be in the amount of the Seller Carry Loan, and must be personally guaranteed by Buyer.

2.  **Interest Rate & Repayment:**
    To account for recent increases in prevailing interest rates, the Seller Carry Loan shall be due in 36-Months at 7.5% Interest Rate (Interest-Only).   The Interest Payment of $31,250/month or $375,000/year shall be paid in Monthly installments by Buyer to Seller on or before the Third Day of each month.  Buyer agrees to pay back $5 Million in lump sum at the end of 36-month period or Buyer agrees to allow Seller to apply the Seller Carry Loan towards the purchase of the completed condominiums (see par. 11 below) and Buyer shall pay Seller any un-used portion of the principal of the Seller Carry Loan.

3.  **Completed Condo Purchases by Seller with Seller Carry Loan Principal at 30% Discount:**
    Buyer agrees to offers Seller the Right of First Refusal to:  1.  Apply the Seller Carry Loan ($5 Million Principal) towards the purchase of the 2 pre-selected, completed condominiums, and 2.  Purchase 2 pre-selected condominiums at 30% Discount from Market Price or List Price at which the condominiums are being marketed, whichever is lower.



4. **Expiration and Acceptance:**
   Please indicate your acceptance of this Letter of Intent by signing below and returning it to **AGENT via Email at (Don Sung)** don.sung@colliers.com **and/or (Roxane Chiang)** rchome888@yahoo.com no later than 5:00 p.m. PST within 3 business days of this Letter of Intent.

This Seller Carry Loan Agreement shall be a separate agreement from the Purchase and Sale Agreement of the Subject Property, and it is a binding agreement between the parties.


Sincerely,


Roxane Chiang
Giant Realty
CA RE License #01460544
rchome888@yahoo.com
Phone:  650-504-5368


Don Sung
Colliers International
CA RE License #01935797
don.sung@colliers.com
Phone:  650-380-5188



**AGREED AND ACCEPTED**

| **Buyer:** | **Nariman Teymourian and/or Assigns** | **Seller:** | **Hu-Hantwo, LLC and/or Assigns** |
|---|---|---|---|
| By: | *Nariman Teymourian and/or Assigns* | By: | *Hu-HanTwo LLC* |
| Date: | 6/21/2022 | Date: | 6/21/2022 |

*NOTICE TO BUYER AND SELLER: COLLIERS INTERNATIONAL, BROKER, IS NOT AUTHORIZED TO GIVE LEGAL OR TAX ADVICE; NO REPRESENTATION OR RECOMMENDATION IS MADE BY COLLIERS INTERNATIONAL, OR ITS AGENTS OR EMPLOYEES AS TO THE LEGAL EFFECT OR TAX CONSEQUENCES OF THIS DOCUMENT OR ANY TRANSACTION RELATING THERETO, SINCE THESE ARE MATTERS WHICH SHOULD BE DISCUSSED WITH YOUR ATTORNEY.*

# EXHIBIT 5



# First American Title Company

One Embarcadero Center, Suite 1150 •San Francisco, CA 94111

*Office Phone:(415)771-8168 Office Fax:*

## Buyer's Final Settlement Statement

| | | | |
|---|---|---|---|
| **Property Address:** | 201 El Camino Real and, 612 Cambridge Avenue, Menlo Park, CA 94025 | **File No:** | 3809-6874957 |
| | | **Officer:** | Patty Franks/PF |
| | | **Settlement Date:** | 08/08/2022 |
| | | **Disbursement Date:** | 08/08/2022 |
| | | **Print Date:** | 08/08/2022, 2:08 PM |

| | |
|---|---|
| **Buyer:** | 201 El Camino Real LLC |
| **Address:** | 66 Barry Lane, Atherton, CA 94027-4023 |
| **Seller:** | Hu-Hantwo LLC |
| **Address:** | 86 Michaels Way, Atherton, CA 94027 |
| **Lender:** | Genesis Capital, LLC |
| **Address:** | 15303 Ventura Boulevard, Suite 700, Sherman Oaks, CA, 91403 |
| **Loan No.:** | G22069679 |

| Charge Description | | Buyer Charge | Buyer Credit |
|---|---|---|---|
| **Consideration:** | | | |
| Total Consideration | | 11,380,000.00 | |
| | | | |
| **Deposits in Escrow:** | | | |
| Receipt No. 509154185 on 07/22/2022 by 2700 Middlefield Road LLC FBO: 201 El Camino Real LLC | | | 200,000.00 |
| | | | |
| **Adjustments:** | | | |
| Seller to credit Buyer | | | 7,200,000.00 |
| | | | |
| **Prorations:** | | | |
| County Taxes - Lot 69  07/01/22 to 08/08/22  @$17,303.08/semi | | | 3,556.74 |
| County Taxes - Lot 70  07/01/22 to 08/08/22  @$12,147.50/semi | | | 2,496.99 |
| County Taxes - Lots 70 and 72  07/01/22 to 08/08/22  @$18,119.42/semi | | | 3,724.55 |
| | | | |
| **New Loan(s):** | | | |
| Lender: Genesis Capital, LLC | | | |
| Loan Amount  - Genesis Capital, LLC | | | 7,397,000.00 |
| Prepaid Interest  08/05/22 to 09/01/22  @$1728.379000/day  to Genesis Capital, LLC | | 46,666.23 | |
| Underwriting Fee  to Genesis Capital, LLC | | 845.00 | |
| Administration Fee  to Genesis Capital, LLC | | 100.00 | |
| Wire Fee  to Genesis Capital, LLC | | 30.00 | |
| Interest Reserve  to Genesis Capital, LLC | | 587,889.99 | |
| Origination Fee  to BluePoint Commercial Mortgage | | 110,955.00 | |
| Appraisal Fee  to Genesis Capital, LLC | | 5,000.00 | |
| Non-Specific Lender Credits  to Genesis Capital, LLC | | | 10,000.00 |
| Mrtg. Broker: BluePoint Commercial Mortgage | | | |
| Broker Fee  to BluePoint Commercial Mortgage | POC-B $20000.00 | 90,955.00 | |
| | | | |
| **Title/Escrow Charges to:** | | | |
| Recording Services  to First American Title Company | | 23.00 | |
| Escrow Fee  to First American Title Company | | 5,975.00 | |
| Notary/Signing Fee  to First American Title Company | | 150.00 | |
| ALTA Loan Policy - Extended  to First American Title Company | | 2,276.00 | |
| ALTA Owner's Policy  to First American Title Company | | 6,600.00 | |
| Record Deed  to San Mateo County Recorder | | 20.00 | |
| Record Deed of Trust - 1  to San Mateo County Recorder | | 65.00 | |
| Record DT & Assignment of Rents  to San Mateo County Recorder | | 77.00 | |
| Affordable Housing Fee  to San Mateo County Recorder | | 225.00 | |
| | | | |
| **Disbursements Paid:** | | | |
| Insurance Premium  to Farmers Insurance | POC-B $9029.86 | | |
| | | | |
| **Cash (  From) (X To) Buyer** | | 2,578,926.16 | |
| | | | |
| **Totals** | | 14,816,778.28 | 14,816,778.28 |

I hereby certify that this is a true and correct
copy of the original.
First American Title Company

By _____

## *Buyer's Final Settlement Statement*

**Settlement Date:** 08/08/2022          **File No:** 3809-6874957
**Print Date:** 08/08/2022          **Officer:** Patty Franks/PF